Good morning, Your Honors. May it please the Court. Vivian Fu for Petitioner Appellant Lanny Woosley. This is a 2254 habeas case governed by AEDPA. Mr. Woosley raises five Miranda-based claims, and with the Court's permission, I'm going to start with the invocation of his right to counsel claim. The trial court found, and there's no dispute on this point, that Woosley was in custody at the point where he asked for a lawyer. The California Court of Appeal determined that defendants request for a lawyer, so I want to talk to my lawyer, please, then. Standing alone was, quote, unequivocal. Pursuant to clearly established Supreme Court law, the analysis should have stopped right there. Once a suspect unequivocally invokes his right to counsel, questioning must stop, pursuant to Miranda, Edwards, and Smith v. Illinois. Without pointing to any ambiguities before the request or inherent in the request itself, the state court used his statements subsequent to his invocation to determine that his request was ambiguous. This is contrary to Smith, where the Supreme Court held that all questioning must cease if nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous. The state court also made an unreasonable determination of the facts, and it characterized his request for counsel as a mere trial balloon that he retracted. And Tom's subsequent queries were meant only to clarify his request for counsel. So what he said, I think, is, I think you're looking at about two hours in, two hours and two minutes, right? Yes. So I want to talk to my lawyer, please, then. Oh, what do you mean? Why do I have to? Why, why, why, why? Okay, I'm already going to jail, right? So it's not just that the statement was that he continued talking. He ends in a question mark seeking a response from the detective. What do we do with that? Well, I think the state court implies that there might have been a reinitiation of interrogation, but I think it's significant that at this point he hasn't been read his Miranda rights. So he doesn't know what his rights are. But counsel, can I just, just to make sure we're on the same page. So then the detective says, well, you know, and then he's, Mr. Woolsey, come on, be straight up with me. He seems to be asking for a response. Well, I would say the initial question was, am I going to jail? He says, am I going to jail? I'm going to jail, right? Which I would characterize as a, you know, a routine question, am I going to jail? Not to initiate discussion relating to the investigation. And, you know, and I would distinguish it from Morgan v. Bradshaw because Tom, he didn't even try to answer his question. He didn't say, you know, you've asked for an attorney. I can't talk to you. Let me read your Miranda rights. Let me ask you a slightly different question. It looks to me as if approximately 45 seconds after that, he's read his Miranda rights. And that nothing he said between I want to talk to my lawyer, please, then, and receiving his Miranda rights, he didn't really say anything except, oh, come on, be straight with me, and the sort of non-substantive discussion that you've had with Judge Christin. So what difference does that make? In other words, basically he says, I want to talk to my lawyer, and the next substantive thing that happens is he's read his Miranda rights, which reinforce that he has the right to talk to a lawyer. So I'm not really sure I understand where the issue lies in that small slice of time. Well, our position is that it's not just that small slice of time. It's, well, the Miranda rights, even assuming that he re-initiated our conversation, the Miranda rights, if we're talking about his self-admonish, you know, his saying it himself, that was definitely not knowing or intelligent. You're talking about the detective at Mirandizingham. The detective at Mirandizingham, again, I think in this specific situation where he's already, you know, invoked his right to counsel twice, I mean, sorry, invoked his right to silence twice, and he's invoked his right to an attorney, the detective just reading his Miranda rights is not enough to satisfy the State's heavy burden of showing a knowing, intelligent, and voluntary waiver. It's a little difficult. Having the same problem now that I had in your briefing, there's this sequence of events that we look at, right? At what point, it's an interrogation for the entire almost four hours. At some point it becomes custodial. You know, typically that's how I envision these, and I think that's how the case law does. But you seem to be jumping back earlier in time and kind of, and I don't know of any case law that does that, where you're sort of putting different sequences together as opposed to drawing a line in the sand to say this became custodial, this became, you know, Miranda was triggered. Well, even going by what the trial court was saying, Miranda was triggered at a minimum at, you know, page 95, or whenever he admitted to the carjacking. So all of this comes afterwards. So he's already in custody. So let's just, even if we're going from the point where there is no dispute that he's in custody, he's, after that, he says he's not going to talk anymore. He asks for an attorney. Miranda has already kicked in what the requirements under, of Miranda. And our position is that they're not met by Tom simply saying, given that he's already, he has already, you know, requested all of these things and invoked his rights pursuant to Miranda, there has to be more than just Tom saying, you know, reading his Miranda rights and saying, do you understand? And he says, yes. And then he says, well, I've already told you everything immediately afterwards. You know, showing that he actually doesn't understand that he, that everything that he said before that can't come in. The, an additional issue I'm having, I was struck by the same thing my colleagues were, that he didn't stop talking after he said, so I want to talk to my lawyer, please, then. Then he started asking questions of the police. In addition, I have a problem because in one of the Edwards line of cases, you had that sort of request and the Supreme Court decided 5-4, it was ambiguous, arguable decision. Nevertheless, I don't see why Edpedeference doesn't kick in at this point and require us to say that the state court decision was not an unreasonable application of Edwards. That deferential EDPA standard is really a problem for me relative to your argument. Are you talking about the fact that he started asking questions after he invoked the right to counsel? That's right. The invocation of the right to counsel was clearly unequivocal and unambiguous. He did... Oh, you're talking about this phrase, do you understand what I'm saying? So I want to talk to my lawyer, please, then. Oh, what do you mean? Why do I have to do, why, why, why, why? Okay, I'm all ready. I'm going to jail, right? Well, you know, come on, be straight up. That's the unambiguous request? Well, the part, so I want to talk to my lawyer, please, then. And then he does say, you know, why am I going to jail? But Tom's response is, well, you know, and Tom keeps asking him additional questions. Well, wait a minute. He didn't stop talking then, that's the thing. But putting that to one side for the moment, why don't we have to apply EDPA deference to the state court decision and conclude that it wasn't an unreasonable application of the Edwards line of authority? Because I think that pursuant to Smith, what you're looking at is the invocation, the specific invocation, which is I want to talk to my lawyer, please. Yeah. And the rest of it I wouldn't. Why don't we have to defer to a reasonable application of Edwards and say that, well, the state court can decide it's ambiguous, you could argue it, but if reasonable jurists could differ, then we have to let the state court decision stand. Well, I think just as in some of these Supreme Court cases, for instance, I'm going to point to Smith, the statement is not, I mean, the state court, the state court's rationale that it was ambiguous and unequivocal is not, is objectively unreasonable. That's really our position. Only if you take it by itself. I mean, suppose some couple is having an argument and one of them says, oh, I'm going to kill you. Not really. Well, if you took the first sentence and that was all the person said, that would be an unambiguous threat. But once they say not really, it obviously is not an unambiguous threat. And as long as the person is still talking when they say not really, why don't you have to take the statements together so that it's at least not unreasonable for a court to conclude that it was not really a threat? Well, I think pursuant to this, the line of Supreme Court cases, you have to, if the actual sentence, I'm going to kill you, is, I mean, that's. Would that be new law, that you have to take an isolated sentence outside the continuous stream of conversation uttered by the suspect? Well, I think that you're, you look at the context before the actual invocation and you're allowed to look at everything before. But he doesn't say anything beforehand. Then he goes to, you know, I want to talk to my lawyer. I want to talk to my lawyer. He doesn't say, maybe I want to talk to my lawyer. I didn't mean that context that broadly. I just meant to that one paragraph between when Woosley starts talking and when he stops talking so that the cop can interject something. Well, I don't think that the sentence that comes immediately afterwards makes the prior sentence ambiguous. He just says, am I going to jail? And then Tom actually very sophisticatedly draws him back into conversation by saying, well, you know, I think you're lying. You know, you said these things. The other people said these other things. And it becomes a back and forth. I think before he, I mean, there's really no, I mean, there's no clarification. Counsel, you have gone over your time, but we've asked you a bunch of questions, so you can have a minute for rebuttal when the time comes as well. And we'll hear from Mr. Ragland. Good morning. May it please the Court. Charles Ragland, Deputy Attorney General for Respondent. I'd like to go directly to the passage that the Court has been focusing on. I'll be referring to page 13 of my appellee's brief where that segment is quoted. As you notice, right before he says, so I want to talk to my lawyer, please, then, that's when Detective Toms is beginning to inform him of his Miranda rights. If you look at a couple statements up before that, Detective Toms says, and I have a lot of questions to ask you to clear that stuff up. But because of the things that are happening here, because you know a couple of things that you said, I want to let you know what your rights are. And that's when Mr. Woosley begins to say he wants to talk to my lawyer, please, but then he has sort of a reaction to the fact that Detective Toms is now going to advise him of his rights. And he says, oh, what do you mean? Why do I have to? Why? Why? Okay, I'm already, I'm going to jail, right? So he's asking Detective Toms these questions immediately after he says, I want to talk to my lawyer, please. Now, this directly distinguishes this case from Smith v. Illinois. In Smith v. Illinois, when you have the unambiguous statement, I'd like to do that when the suspect is told about his right to have an attorney, you have questioning from the police before you have any statement that casts an ambiguity on the suspect's initial statement. Here we don't have any intervening police questioning. Mr. Woosley says, so I want to talk to my lawyer, please. And without interruption, he continues talking and then asks the detective the question, I'm going to jail, right? So Mr. Woosley himself has made his statement ambiguous. To lift that one sentence out of his statement would, as Judge Kleinfeld said, create new law. There is no precedent for taking one unambiguous statement, which is then followed by ambiguous statements or statements that make that ambiguous. Well, there is. There is. I mean, that's the problem. It's right on the border, arguably. That's your opponent's argument, that when there's an unambiguous statement, questioning has to stop, period, right? That's the rule. And the problem is that we've got here is that the defendant continues himself, right? He continues himself. And even the state court said if this had been a standalone statement, it would have been unambiguous, right? And I don't hear you to be disputing that. It's just the second part of the paragraph is that the defendant continued. And it seems to me to be important that he not only continued talking, he ends in a question to the detective asking the detective to continue. Yes. When you look at Smith v. Illinois, that's the closest we have here, and that case is distinguishable because there was intervening questioning. Right. Can I ask you a different question? We have so little time. When I take a step back, this is a case where, of course, terribly, terribly significant consequences. And you have strong arguments, I think, for each of the many arguments raised here, not to mention there are procedural issues that we haven't talked about yet today. And yet, when I take a step back, this was a late night interview that lasted almost four hours. The detective was quite relentless, although not shouting, but very relentless, certainly very skilled in experience. Three requests to go home that were overlooked entirely. It's troubling, counsel. Well, when you do take a step back, and especially when you watch the actual videotape, you can see that Mr. Woosley himself... I have done that, by the way, just so you know. So you'll recall that Mr. Woosley himself is just as interested in talking to Detective Toms as Detective Toms is in talking to Mr. Woosley. And the Supreme Court has said in precedent that suspects have the right to control the interrogation, what subjects are discussed. He asked to go home three times, and there is a flavor to this interview that the defendant gives up, because his requests to go home are ignored, and the conversation goes on. What's your response? That part I disagree with you, that he's requesting to go home and those requests are ignored. When you look at those requests to go home, he's really saying he doesn't have time to take the polygraph. Counsel, I strongly disagree with that. So what is your response about the 30,000 level? And I understand we parsed these very closely, but you don't find this to be an interview, a custodial interrogation that's close to the line? Is that your position, really? Well, the trial court did exclude part of the... The Miranda violation is what it did. Yes, and the trial court correctly, after the court determined he was in custody because he admitted engaging in this carjacking, carjacking excluded that part of the interview until he was Mirandized, and that's fully consistent with the Elstad... So let's talk about Siebert, because that wasn't even raised in the trial court, except by the Superior Court judge who was clearly concerned about the two-step interrogation technique. The State court found no evidence that this was an intentional two-step interrogation. Correct. And what if that's unreasonable? There certainly is some evidence very consistent with, the sequence here is certainly consistent with intentionality. No, that is quite a stretch to say that this is anywhere close to Siebert. In Siebert, you have custody from the beginning. I know what Siebert is. Okay. So tell me what your response is. Well, here you have a voluntary interview. It begins voluntary, and the court has acknowledged that officers may not be as precise in determining when it becomes custodial, when you're talking about a... Okay, but in this case, unlike Siebert, there's a Miranda violation. So the State court has determined it became custodial, at least as of the time of the admission of participation in the carjacking. So I'm just concerned about, and there's an EDPA standard, and we've got procedural hurdles, but what is the State's response to that finding, that there is no evidence consistent with an intentional Siebert violation? First of all, this case is much closer to Elstad than it is to Siebert. You have no testimony from the officer that he was intentionally... I appreciate that. I'm using Siebert writ large, that line of cases. Okay. Okay. The two-step interrogation technique. Right. This is much closer to Elstad, where there's a technical Miranda violation because he should have been advised at the time he said something that would cause a reasonable person to believe that they're not free to leave, but that's it. There's no evidence that this detective intentionally withheld Miranda warnings. There's no evidence that he was trained to do that, unlike Siebert. The court, as you said, the trial court was concerned about Siebert, but when you look at the trial judge's discussion of Siebert, he quickly puts that aside. He says, there's two issues I want to just quickly put aside. So here's why it is consistent, or at least I wouldn't put aside quickly. Okay. This is an experienced detective. It was late at night. It was almost a four-hour interrogation. He had talked to several witnesses who had fingered this person in these very serious crimes. He disregarded several requests to attempt to go home. There's a lot that would look like there's a reason this was triggering a Siebert inquiry in the superior court judge, and then there is, in fact, a Miranda violation found by the state court, and then there was a re-Miranda, you know, the detective re-Mirandaized this individual, and then the individual said, very classic with the Siebert two-step interrogation technique, he said, I've already told you everything. Why do I even have to repeat it, which is exactly what we worry about, right? You do worry about that. In this case, that statement is not that significant. He has been saying that all night long. Remember, he starts off by saying he wasn't even in the car. The detective says, I know you were in the car because I've talked to these other witnesses. So he continues to ask him to tell me the truth, tell me more, tell me what happened in the car, and Mr. Woosley keeps saying, I've told you everything. I told you everything. I am telling you the truth. I don't know why those people would say that. So when we get to that point, it's not as if Mr. Woosley is saying, wait, I've already told you everything. You just duped me into confessing without the warnings, and now you're giving me the warnings. That's not the situation we have here. Mr. Woosley had consistently said he was telling the officer everything, but then as often these things go, as the officer continued to ask questions, he then began to relent and said, okay, well, I was there in the car, but I wasn't the shooter. I didn't know what he was going to do. I take it the State's argument is that the Siebert violation is entirely defaulted, procedurally defaulted. Yes, procedurally defaulted. Thank you. And the last thing, I believe I have 30 seconds left. The last thing is, as Judge Kleinfeld brought up, the standard of review here under AEDPA is paramount. We're discussing these things, the way that whether these requests were ignored, whether there was any evidence of intentional conduct by the detective. Reasonable people can disagree as to those things. Therefore, under the AEDPA standard, the State court's decision should be respected and habeas relief should be denied. Thank you. Thank you. Ms. Fu, you have a minute for a rebuttal. I just want to touch on what Judge Christin said. I think this is a textbook example of Siebert. I mean, he basically also the interview took place in 2004, which was right before Siebert came out. So, you know, to give him the benefit of the doubt, he may not have thought that it was against the law what he was doing. Do you agree or disagree that this claim was procedurally defaulted? No. Our position is that it's not procedurally defaulted. Can you give me the response to that? How is it not defaulted? I think that's set forth in the briefing pretty. Why don't you summarize it for us? So basically I think that the State court said that it was defaulted because there was no objection below. The contemporary objection rule as applied in this case where the trial court went through systematically all the points that are deemed procedurally defaulted and discussed them and had an opportunity to address them. That happened in this case. So in this specific case where the trial. Because it was actually raised and considered by the trial court. It was actually raised and considered by the trial court. The Miranda objection was raised by trial counsel. I mean, arguably he could have done it much better, but he did raise it. There was an opportunity to address it. So, you know, this court has held that the California courts deem very broadly. I'm sorry, I'm losing my train of thought. But that in this case, the reasoning behind the contemporary objection rule, it doesn't apply here because the trial court had the opportunity to address the issues. Counsel did address it. Am I correct in understanding this about the California rule? If there's something in limine, probably a motion to suppress, and the defendant loses, the defendant still has to object during the trial when the evidence that the judge has already decided can come in is offered? I'm sorry, could you? You have a motion to suppress. Defendant loses. Go to trial. At trial, the evidence that was at issue on the motion to suppress is offered by the prosecutor. Is it the California rule that the defendant must then object again at trial? No, I don't believe so because the trial court has already ruled against the defendant. So for the defendant to lodge another objection where the trial court has already ruled, it would be pointless. And so I actually think there's state court cases that say the defendant isn't required to just lodge a pointless objection. Thank you, counsel. The case just argued is submitted, and we appreciate the arguments from both of you.
judges: Kleinfeld, Graber, Christen